# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Crim. Action No.: 1:23CR289(ABJ)** |
| **MATT LOGANBILL,** | |
| **Defendant.** | |

## <u>MOTION FOR TRANSFER OF VENUE</u>

Matthew Loganbill, through undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 21(a), and the Fifth, Sixth, and Eighth Amendments to the United States Constitution, respectfully requests that this Court move his trial outside the District of Columbia. Recent venue data reveals an overwhelming presumption of guilt among prospective D.C. jurors and that D.C. jurors are demonstrably more hostile towards January 6 defendants than adults surveyed nationwide, as well as in a demographically comparable federal court division. In light of this data, the characteristics of the D.C. jury pool, and the impact of sustained and inflammatory media coverage on the D.C. jury pool, transfer out of this district is the only way to protect Mr. Loganbill's constitutional rights to due process and a fair trial.[1]

---

[1] This Motion is identical to the Motion filed in *U.S. v. Loganbill*, 1:21CR593, which the Court considered and denied. The D.C. Circuit and the Supreme Court have not considered the issues raised in the instant Motion. Counsel files the instant Motion to preserve Mr. Loganbill's record.

**ARGUMENT**

Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. U.S. Const. amends. V, VI; *see also Skilling v. United States*, 561 U.S. 358, 378 (2010). The importance of an impartial jury is so fundamental to Due Process that when prejudice makes it such that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court *must* transfer the proceedings upon the defendant's motion. Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378.

In some instances, the hostility of a venue is so severe that there can be "a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031, (1984). If the defendant demonstrates that "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial," then "the court must transfer the proceeding… to another district." Fed. R. Crim. P. 21. As recently as 2010, the Supreme Court reaffirmed the presumption approach articulated in *Patton* and identified three factors to guide trial and appellate courts in determining whether a presumption should attach: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage.[2] *Skilling*, 561 U.S. at 378.

---

[2] Though not relevant to the instant motion, the Supreme Court identified a fourth factor for consideration upon appellate review, following trial in the contested venue: (4) whether the jury convicted the defendant on all counts or only on a subset of

Where presumption of prejudice attaches, the Supreme Court has further recognized that it overrides juror declarations of impartiality during *voir dire* because such attestations may be insufficient to protect a defendant's rights in particularly charged cases. *Murphy v. Florida.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory.").  Indeed, on appeal of a denial of a motion for change of venue, an appellate court need not even examine the *voir dire* record if it finds that the presumption attached.  *Rideau v. Louisiana*, 373 U.S. 723, 727 (1963) ("But we do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a [transfer]."). Thus, *voir dire* is not a cure for significant and substantiated Due Process concerns about the jury pool.

Mr. Loganbill respectfully submits that each of the three *Skilling* factors compels transfer of venue in this case.

## I. The survey data, size, and characteristics of the D.C. jury pool demonstrate that the presumption of juror prejudice attaches.

The foundation for the presumption of prejudice is found in *Rideau*, 373 U.S. at 727. In *Rideau*, half of the small jury pool had been exposed to prejudicial media— a widely-circulated video of the defendant's confession. *Id.* at 726. Despite *voir dire* revealing that only three seated jurors had actually seen the broadcasts at issue, the

---

counts. The lack of uniformity in result after denial of a motion to transfer venue, the Court observed, indicates that the jury was impartial and capable of rendering a verdict on only the facts presented, rather than preconceived notions of guilt. 561 U.S. at 383.

Court found that the share of the pool that the video tainted was significant enough to render the defendant presumptively prejudiced. *Id*. at 725. In applying *Rideau*, many courts have focused on population size and diversity as a proxy for the population's share that was likely impacted. For example, in *Skilling*, the Court observed that while the number of Enron victims in Houston was higher than that of other crimes, it was far from universal: because Houston is the fourth-largest city in the United States and highly diverse, a significant number of prospective jurors would lack any connection to Enron. *Skilling*, 561 U.S. at 358 ("[E]xtensive screening questionnaire and followup [sic] *voir dire* yielded jurors whose links to Enron were either nonexistent or attenuated.").

Three circumstances of Mr. Loganbill's case distinguish it from *Skilling*: 1) the size and demographics of D.C., 2) the unprecedented impact of the event of January 6 on D.C. and its residents, and 3) the steady drumbeat of pre-trial publicity. Therefore, this case more closely parallels the presumptively prejudicial circumstances in *Rideau*. Indeed, survey data confirms the conclusion that Mr. Loganbill will not be able to assemble a fair and impartial jury as the Constitution requires.

### A.    Survey data show that prejudice has attached.

On behalf of all indigent clients charged in the wake of January 6, the Federal Public Defender for D.C. retained the services of the professionals of Select Litigation to survey the D.C. jury pool. As explained in its report ("SL Report"), attached as Exhibit 1, Select Litigation polled 400 potential D.C. jurors, and 400 potential jurors

4

in the Atlanta Division of the Northern District of Georgia. The firm also retained the services of a media research firm, News Exposure, to analyze aspects of news coverage concerning January 6. *See* Ex. 1, App. B. A second survey was conducted by In Lux Research ("ILR Report"), attached as Exhibit 2, on behalf of defendants Thomas Caldwell and Connie Meggs, No. 21-cr-028 (APM), ECF 654. These two surveys lead to the inescapable conclusion that prejudice has attached to the D.C. jury pool.

> **1.  *Significant majorities of potential jurors in D.C. have prejudged the January 6 defendants – and will place the burden on Mr. GossJankowski.***

Both surveys of D.C. potential jurors show that significant majorities have unfavorable impressions of January 6 defendants, have already concluded they are guilty, and have already concluded they had the specific intent to obstruct.

Exhibit 1 (Letter) summarizes Select Litigation's findings. Highlights include that D.C. residents overwhelmingly:

- have unfavorable opinions of those arrested for participating in the January 6 demonstrations (84%); and

- would characterize these individuals with broad brushes as conspiracy theorists, white supremacists, and members of violent right-wing organizations (70%, 58%, 54% respectively).

SL Report ¶¶ 9, 14. These results illustrate that a D.C. jury pool will place a burden on Mr. Loganbill to prove that he is not a member of such groups. The survey indicates that most of the jurors will be predisposed against Mr. Loganbill, will likely view him

as guilty of conduct other than that with which he is charged, and will likely consider him as posing a danger to the community broadly, notwithstanding the strength or weakness of the evidence that he committed the crimes charged.

Significant majorities also:

- would characterize these individuals as "criminals" (62%); and

- have already formed the opinion that these individuals are people "guilty" of the charges brought against them (71%).

SL Report ¶¶ 14, 10. Again, the results indicate that the D.C. jury pool will transfer the burden to Mr. Loganbill to prove his innocence.

Despite jurors' well-known duty not to determine guilt before hearing the evidence, over half of D.C. respondents admit that they are more likely to vote "guilty" if they find themselves on a jury in one of these cases (52%). SL Report ¶ 11.

Equally alarming, one-third of D.C. respondents would not trust a D.C. jury to give them a fair trial if they were accused of violating the law on January 6th. SL Report ¶ 8 (reporting that only 67% of potential D.C. jurors stated that they believe that they personally would receive a fair trial if they were defendants in a January 6 case).

Further, the assessment of those respondents who claim that the January 6 defendants *can* get a fair trial is suspect. Of those who believe that January 6 defendants can get a fair trial in D.C., 76% have already decided that these defendants are guilty. *Id.* ¶ 12. Further, 56% of that group confessed that they would be more likely to vote "guilty" if they were on a jury. *Id.*

6

The ILR Report reveals similar results.  Indeed, 91% of the D.C. respondents who answered the "pre-judgment test questions" admitted to making at least one prejudicial prejudgment. ILR Report at 2. In that survey, 85% of the D.C. respondents characterized the events of January 6 as criminal in nature, even when given the option to reserve judgment on that question. *Id*. at 3. Seventy-two percent of the respondents said that they are likely to find the defendants guilty, even when given the choice if "it is too early to decide." *Id*. The survey also demonstrates that the bias is far more prevalent among D.C. respondents than the three other judicial districts surveyed. ILR Report, Table 1(A) and (B), Figure 1 and 2.

Perhaps most striking of all, both surveys show that an overwhelming percentage of D.C. residents have already made up their minds about an essential element for several counts in the Superseding Indictment. To prove that Mr. Loganbill "corruptly" obstructed an official proceeding under 18 U.S.C. § 1512(c)(2) as charged, the government must at least prove that a defendant acted with the specific intent to obstruct a Congressional proceeding (the counting of electoral votes, in the government's theory). To prove that he knowingly entered a restricted building, the government must prove that he entered the Capitol building or grounds and knew it was restricted as defined by the statute. 18 U.S.C. § 1752.

The survey data reveals that overwhelming majorities of D.C. respondents have already concluded that those who entered the Capitol on January 6 were acting with that intent. Respondents overwhelmingly concluded that January 6 defendants were:

- trying to overturn the election and keep Donald Trump in power (85%);

- insurrectionists (76%); and/or

- trying to overthrow the United States government (72%).

SL Report ¶¶ 15, 18.

Likewise, the ILR Report showed that 71% of D.C. respondents believe that all who entered the Capitol without authorization planned in advance to so, even when offered options to reserve judgment on that question. ILR Report at 3. The median response in all the districts surveyed for that question was 49%. *Id.* Thus, not only have most D.C. respondents reached the broad conclusion that January 6 defendants are all "guilty," but the vast majority have prejudged an element essential to several charges in the case.

This is the type of pernicious bias that a typical *voir dire* would not reveal, as *voir dire* usually does not entail inquiring into jurors' ideas about each element of charged offenses. And asking jurors to state whether they have reached conclusions that they cannot set aside during the trial will not reveal such prejudgment: jurors do not always understand which of their opinions are relevant, and what they cannot take for granted without proof beyond a reasonable doubt. *See Smith v. Phillips*, 455 U.S. 209, 221-22 (1982)) (O'Connor, J., concurring) ("Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it.").

8

That is the case here: many who expressed confidence that January 6 defendants can obtain a fair trial have already prejudged an essential element in the case. That is, 78% of those surveyed who say that they believe the defendants will receive a fair trial also take it as a given that defendants who entered the building were trying to overthrow the government and/or to keep Donald Trump in power.  SL Report ¶ 16.

At a minimum, the survey results require the Court to itself *voir dire* potential jurors and to allow attorney-conducted *voir dire* about this issue. However, that solution is constitutionally insufficient. Unless the *voir dire* probes every element of each charged offense, for example whether the jury could believe that any action directed at law enforcement could possibly have been justified by police misconduct, the results show that *voir dire* cannot be expected to preserve Mr. Loganbill's right to an impartial jury in this District.

### 2.   *Survey results from the Northern District of Georgia are powerful evidence that D.C. residents are particularly unlikely to be impartial.*

Select Litigation's study shows that this District is perhaps uniquely unlikely to produce an impartial jury. The District of Columbia is unlike any other district.  It is one of the least populous federal court districts. A significant share of its population is employed by the federal government. And the ratio of Biden to Trump supporters in 2020 was more lopsided than in any other federal court division.  SL Report ¶ 22. These unique attributes lead to the conclusion that the January 6 defendants cannot assemble an impartial jury in D.C.

Select Litigation surveyed 400 prospective jurors in the Atlanta Division of the Northern District of Georgia, which is similar demographically to D.C. SL Report ¶¶ 19-26. The results show that significantly fewer potential Atlanta jurors have set their minds against January 6 defendants. For example:

- 84% of D.C. survey respondents view people arrested in the wake of January 6th unfavorably, but only 54% of Atlanta division respondents do;

- 71% of D.C. respondents believe that individuals charged are guilty, but only 54% of Atlanta division respondents share this opinion;

- More than half of D.C. respondents say they are more likely to vote "guilty" if on a jury, but fewer than half of Atlanta division respondents say this;

- 62% of D.C. respondents characterize the January 6 defendants as "criminals," and well over 50% characterize them as "white supremacists" and "members of a violent right-wing organization," whereas fewer than half of Atlanta division respondents would characterize the January 6 defendants in these three ways (48%, 40%, and 39%, respectively).

SL Report ¶¶ 23, 24.

Finally, evidence suggests that jurors in other districts resemble Atlantans more than D.C. residents. Select Litigation asked both sets of survey respondents to state whether they associated those who entered the Capitol on January 6 with certain purposes, a question that had also been asked in a recent national poll

recently conducted by CBS/YouGov. SL Report ¶¶ 3, 18, 25.[3] The results show that potential jurors in Atlanta hold prejudicial views on this issue at similar rates as national survey respondents. *Id.* ¶ 25. By contrast, a far greater share of D.C.'s potential jurors hold prejudicial views on this issue.

| Comparison of Beliefs among Jury-eligible Citizens in D.C. & Atlanta Division, & adults nationwide | | | | |
|---|---|---|---|---|
| | | USA | D.C. | GA |
| Trying to overturn the election and keep Donald Trump in Power | Would | 63% | 84% | 68% |
| | Would not | 37 | 9 | 19 |
| Insurrection | Would | 55% | 76% | 55% |
| | Would not | 45 | 13 | 27 |
| Trying to overthrow the US government | Would | 54% | 72% | 57% |
| | Would not | 46 | 20 | 33 |
| A protest that went too far | Would | 76% | 69% | 70% |
| | Would not | 24 | 24 | 21 |
| Patriotism | Would | 26% | 13% | 25% |
| | Would not | 74 | 81 | 63 |
| Defending freedom | Would | 28% | 10% | 21% |
| | Would not | 72 | 86 | 70 |

---

[3] The results of the poll are reviewed at https://drive.google.com/file/d/1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view (last visited 8/26/23). As noted in Select Litigation's Report, the firm mirrored the wording of the CBS/YouGov poll as closely as possible to maximize the comparative value, even though Select Litigation would have used different wording. Further, differences in methodology mean the comparison is not perfect. *See* SL Report ¶¶ 17-18.

**B.    The size and makeup of the D.C juror pool ensures that prejudice has attached.**

The District of Columbia is a compact major U.S. city and the smallest federal district in the nation. Counsel respectfully submits that, due to the district's unique characteristics, prejudice has attached.

First, the government and the media have portrayed the events of January 6 as an attempt to overthrow the government – and an attack on democracy itself.[4] As the Court is aware, a large proportion of D.C. residents either work for the federal government themselves or have friends or family who do. As of September 2017, the U.S. Office of Personnel Management reported that there are 600,000 federal civil workers and annuitants in the greater D.C. area (not including postal workers, F.B.I. employees, and staff on several federal commissions).[5] Nearly 190,000 of those workers and annuitants work within D.C. itself. *Id.* With a total population of around 690,000,[6] it seems clear that any given member of the district's jury pool has a greater likelihood of being closely connected to the federal government than one in a

---

[4] *See, e.g.,* Kevin McCoy & Kevin Johnson, *Investigators Signal Some Capitol Riot Suspects Could Be Charged with Conspiring to Overthrow U.S. Government*, USA Today, (Feb. 19, 2021), https://www.usatoday.com/story/news/2021/02/19/capitol-riot-did-conspirators-try-overthrow-u-s-government/6750393002/; *see also The January 6 Attack on the U.S. Capitol*, American Oversight (Jan. 5, 2022), https://www.americanoversight.org/investigation/the-january-6-attack-on-the-u-s-capitol. ("Trump supporters having for weeks discussed openly their plans for a violent overthrow.").

[5] *Federal Civilian Employment*, OPM (Sept. 2017), https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.

[6] District of Columbia Population – April 1, 2020, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/washingtoncitydistrictofcolumbia,US.

comparable metro area. In fact, as of 2019, according to the D.C. Policy Center, *active* federal employment (including postal workers) accounts for nearly a third of all jobs in D.C. itself, which figure does not include the many retired and former federal employees living in D.C.[7]

Importantly, nearly 15,000 D.C. metro area residents work for Congress directly, each of whom have friends and family in D.C.[8] Many others have friends and family in law enforcement that responded to the Capitol on January 6.[9]

---

[7] *Trends in Federal Employment in DC,* DC Pol'y Ctr. (Mar. 28, 2019), https://www.dcpolicycenter.org/wp-content/uploads/3019/03/Fed-jobs-role-in-DC-economy.png.

[8] *Vital Statistics on Congress*, Brookings Institute (July 11, 2013), https://www.brookings.edu/wp-content/uploads/2016/06/Vital-Statistics-Chapter-5-Congressional-Staff-and-Operating-Expenses_UPDATE.pdf.

[9] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. *Human Capital Strategic Plan 2021-2025*, U.S. Cap. Police 1, 12 fig. 5 (2020), https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf. 4,400 individuals are employed by the Metropolitan Police Force, and 2,700 individuals are active members of the D.C. National Guard. *See Metropolitan Police Force Annual Report 2020*, Gov't D.C. Metro. Police Dep't 32 (2020), https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020_lowres_a.pdf; *see also About Us*, DC Nat'l Guard (last visited Apr. 23, 2022), https://dc.ng.mil/About-Us/. More than 140 officers were allegedly injured from the events of January 6. *See* Michael Schmidt*, Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot*, N.Y. Times (July 12, 2021), https://www.nytimes.com/2021/02/11/us/politics/capitol-riot-police-officer-injuries.html. And while not all individuals employed by these agencies reported to the Capitol on January 6, all 9,350 individuals *were* directly and adversely affected by the January 6 events in the form of increased presence and overtime demands in the weeks that followed, greatly affecting morale. Indeed, as reported by local media, more than 75 officers left the Capitol Police force in the few months following January 6. Celine Castronuovo, *More Than 75 Capitol Police Officers Have Quit Amid Low Morale Since Jan. 6*, The Hill (July 7, 2021, 11:01 AM)), https://thehill.com/policy/national-security/561832-more-than-75-capitol-police-officers-have-quit-amid-low-morale-since.

In sum, an enormous share of D.C. residents has connections with the federal government and entities that were directly affected by January 6. The quantity of such connections is unlikely to be present in any other district. Because the government and much of the media have characterized the events of January 6 – including the attempted obstruction in which the government alleges Mr. Loganbill participated – as an attack on our elections, government institutions generally, and democracy as a whole, a disproportionate number of D.C. residents are more likely to view themselves as the direct victims of the events.

Moreover, even D.C. residents not employed by the government report feeling deeply traumatized by the events that took place so close to where they live and work. For example, one D.C. resident shared in an interview that:

> I have not been able to digest any of the atrocities that took place last night here in Washington, D.C., you know, literally eight blocks away from my front door[.] I've been having a lot of conversations with people this morning, loved ones. We're all hurting. We're terrified. We're in shock. And I think it's going to take a while. This is by far the darkest moment of my 45-year existence.[10]

In interviews in the days following January 6, the D.C. Mayor declared a state of emergency, implemented a city-wide curfew, restricted access to particular roads and bridges, and requested that residents not attend inauguration.[11] Metropolitan Police

---

[10] *D.C. Resident Who Gave BLM Protesters Refuge Condemns 'Atrocities' at U.S. Capitol*, CBC Radio (Jan. 7, 2021, 5:45 PM), https://www.cbc.ca/radio/asithappens/as-it-happens-thursday-edition-1.5864816/d-c-resident-who-gave-blm-protesters-refuge-condemns-atrocities-at-u-s-capitol-1.5864894.

[11] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, Gov't D.C. Muriel Bowser, Mayor (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today; *Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, Gov't D.C. Muriel Bowser, Mayor

and over 25,000 military personnel occupied D.C. neighborhoods in the weeks that

followed.[12] Indeed, a local subsidiary of the national public broadcasting network,

*D.C.ist*, reported that:

> Some residents have rescheduled medical appointments or switched up
> their bike and run routes to steer clear of downtown D.C. or the Capitol
> complex. Others say they are avoiding speaking Spanish in public or
> buying items like baseball bats for personal protection. Some are
> making plans to leave the city for inauguration. And many have feelings
> of anger, sadness, and heightened anticipation for the near future. […]
> Some residents are also worried that a stepped up military and police
> presence in the city may only add to their unease.[13]

As the Court is no doubt aware, the effects of these events continue to be felt in D.C.

Prior to protests to support detained January 6 defendants planned for September

2021, the Associated Press similarly reported, "In Edgy Washington, Police

Outnumber Jan 6 Protestors."[14]

Further, an overwhelming number of D.C. residents — over 92 percent — voted

for President Biden.[15] According to the government's theory of the case, many of those

---

(Jan       6,       2021),       https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1; Jane Recker, *DC Mayor Says Americans Should Not Come to Washington for the Inauguration*, Washingtonian (Jan. 11, 2021) (noting the many street closures),       https://www.washingtonian.com/2021/01/11/dc-mayor-says-americans-should-not-come-to-washington-for-the-inauguration/.

[12] Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden Inauguration*, The Hill (Jan. 15, 2021, 3:55 PM),https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-for-biden-inauguration.

[13] Jenny Gathright & Rachel Kurzius, *What It Feels Like to Live Under D.C.'s State of Emergency*, DCist (Jan. 13, 2021 12:27 PM),       https://dcist.com/story/21/01/13/dc-state-of-emergency-residents/.

[14] Associated Press, *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, US News (Sept. 18, 2021),https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rally-supporting-jan-6-rioters.

[15] *General Election 2020: Certified Results*, DC Bd. Elections (Dec. 2, 2020, 11:26 AM), https://electionresults.dcboe.org/election_results/2020-General-Election.

who came to the Capitol in connection with January 6 acted to prevent Joseph Biden from becoming President. Again, this stark political divide (and impact on juror attitudes) would not be as uniformly present in a different jurisdiction.

Finally, the government, the media, and judges in this district speak of January 6 prosecutions as designed to prevent "another January 6."[16] As such, D.C. residents as jurors are highly likely to view Mr. Loganbill not only as someone who victimized them, but also as someone who might victimize them again, raising a concern about conviction for prevention rather than Mr. Loganbill rather than individual guilt.

The survey results, size, and characteristics of the D.C. jury pool make clear that prejudice has attached, and that Mr. Loganbill cannot obtain a fair and impartial trial here.

### C. Media coverage in the district also prejudices Mr. Loganbill.

The Sixth Amendment guards against jurors' conclusions being induced by "*any* outside influence" rather than "only by evidence and argument in open court[.]" *Skilling*, 571 U.S. at 378 (quoting *Patterson v. Colo. ex rel. Att'y Gen.*, 205 U.S. 454,

---

[16] *See, e.g.*, Zachary B. Wolf, *These Republicans Are Worried About Trump's Attempted Coup 2.0*, CNN (Nov. 5, 2021) https://www.cnn.com/2021/11/05/politics/january-6-insurrection-trump-documentary-what-matters/index.html*; see also* Jordan Fischer et. al, 'Resolving the crime of the century with misdemeanors' | *Judge Skewers DOJ At January 6 Sentencing*, WUSA9 (Oct. 28, 2021, 2:47 PM), https://www.wusa9.com/article/news/national/capitol-riots/resolving-the-crime-of-the-century-with-misdemeanors-judge-skewers-doj-at-january-6-sentencing-beryl-howell-jack-griffith-anna-morgan-lloyd/65-352274e8-7279-4792-a878-cf4cb0cc20ae (explaining that the sentence was **designed to alert** "others who might consider attacking the Capitol to know their punishment would 'hurt.'"),

462 (1907)) (emphasis added). That outside influence can be "public print" *or* "private talk." *Id.* (quoting *Patterson*, 205 U.S. at 462). It can be "the sheer number of victims." *See id.* at 437-38 (Sotomayor, J., concurring in part and dissenting in part) (quoting with approval the Fifth Circuit's statement that the district court overseeing Skilling's trial "seemed to overlook that the prejudice came from more than just pretrial media publicity, but also from the sheer number of victims"). The improper outside influence may be the *nature* of the media to which jurors have been exposed, or its prevalence close to the time of the trial, or its tendency to provoke identification with those directly affected by the conduct at issue such that the jurors feel a personal stake in the outcome. *See Skilling*, 561 U.S. at 372 (discussing broadcast of confession in small town in *Rideau v. Louisiana*, 373 U.S. 723 (1963)); *United States v. McVeigh*, 918 F. Supp. 1467, 1473 (W.D. Okla. 1996). The outside influence may also be "such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience." *McVeigh*, 918 F. Supp. at 1473.

Like the pretrial publicity in *Rideau* that led the Supreme Court to rule that the district court should have transferred the case to a new venue, the pretrial publicity about January 6 cases has "invited prejudgment of . . . culpability" and been of the "smoking gun variety." *Skilling*, 561 U.S. at 383.[17] In *Rideau*, the Court

---

[17] In *Skilling v. United States*, although the Court established no bright line rules about when media can contribute to a constitutional need to transfer venue, Justice Ginsberg noted that, when the Court has ruled that a case should have been transferred to a new venue in order to preserve defendants' constitutional right to trial by an impartial jury, it has emphasized (1) "the size and characteristics of" the

concluded that no *voir dire* could cleanse the taint of a video of the defendant's uncounseled interrogation and "confession," which had been broadcast in a small town several times before trial. *Rideau*, 373 U.S. at 727. Here, potential jurors have been exposed to hours and hours of videos of the events of January 6 and hundreds of images of those events.

Whereas the single recording at issue in *Rideau* captured a "dramatically staged confession of guilt," the hundreds of January 6 videos and photos circulated over the last 20 months capture many of the alleged crimes themselves. *Skilling*, 561 U.S. at 382-83. Vivid images splashed across D.C. papers and television for the last 20 months show people scaling the Capitol walls, hoisting a hangman's gallows and noose, waving Confederate flags, putting their feet on the desks in the Capitol, rifling through papers on congressional desks, hanging from the balconies in the Senate Chamber, and trying to break into the House chamber, among hundreds of other scenes.[18] Many of the images are "likely imprinted indelibly in the mind of anyone

---

district, (2) the extent to which news stories about the defendant contained confessions "or other blatantly prejudicial information of the type readers or viewers" in that venue "could not reasonably be expected to shut from sight," and (3) the time that has passed between periods of significant publicity and the trial. *Skilling,* 561 U.S. at 382-83; *id.* at 381 ("[P]resumption of prejudice . . . attends only the extreme case.").

[18] *See, e.g.* Staff, *'No pictures, no pictures': The Enduring Images from Jan. 6*, The Washington Post (Jan. 4, 2022), https://www.washingtonpost.com/nation/interactive/2022/photos-jan-6-capitol/ (last visited 4/23/22); *Chilling Images from the Capitol Riot: Jan. 6 Insurrection in Photos*, USA Today (Jan. 5. 2022, 10:00 AM), https://www. usatoday.com/picture-gallery/news/politics/2022/01/03/jan-6-insurrection-photos-capitol-riot/9052798002/ last visited 4/23/22); D. Bennett, et al., 41 Minutes of Fear: A Video Timeline from Inside the Capitol Siege, The Washington Post (Jan. 16, 2021),

who [viewed them]," just like the recorded interrogation in *Rideau* would have been. *See Skilling*, 561 at 382-83. Most, if not all, of this evidence has nothing to do with Mr. Loganbill or this prosecution, but because D.C. jurors have been inundated with these videos for almost two years, they cannot be expected to "shut [them] from sight" during trial. *See Skilling*, 561 U.S. at 382.

As such, the pretrial publicity about January 6 has been "blatantly prejudicial," and is distinguishable from the type of press coverage that failed to convince the Supreme Court in *Skilling*. 561 U.S. at 382-83 (distinguishing publicity in that case from the publicity in *Rideau* because it contained "[n]o evidence of the smoking-gun variety" and was not so shocking that it could not be shut from jurors' minds during trial).

Moreover, data gathered by News Exposure establishes that coverage of January 6 has been extensive and persistent, particularly in D.C. In one year, D.C. newspapers published at least 500 articles about January 6, and local news syndicates broadcast over 7000 stories about the day. Ex. 1, App. B-7 (print data); App. B-1 (broadcast data).[19] This coverage is far more extensive and contemporaneous than that in *Skilling*. *See Skilling*, U.S. at 428-30 (Sotomayor, J., concurring in part and dissenting in part) (noting that it took multiple years between

---

https://www.washingtonpost.com/investigations/2021/01/16/video-timeline-capitol-siege/  (last visited 4/23/22).

[19] These estimates may understate coverage of January 6, as News Exposure only counted hits containing a short list of terms: "January 6 riot" or "Capitol insurrection" or "Capitol riot" or "2021 US Capitol attack" or "Capitol violence." The Washington, DC newspapers News Exposure considered were *The Washington Post, The Washington Times*, and *Washington Examiner*.

Enron's collapse and trial for there to accumulate hundreds of *Houston Chronicle* articles, and 1,600 local broadcast stories about Skilling);

News Exposure also analyzed coverage of January 6 in the Northern District of Georgia. SL Report ¶¶ 27-32. Comparison of coverage in this District to coverage in Atlanta reinforces how persistent coverage has been in D.C. The lowest month of January 6 coverage in D.C. still surpassed January 6 coverage in 9 out of 12 months in Atlanta. SL Report ¶ 30; *see also* Ex. 1, App. B-1, B-2 (August 2021 in D.C. had the lowest coverage of January 6 and, even then, it surpassed Atlanta's coverage in all but 3 months of the study). The data also show that D.C. print, broadcast, and web coverage of January 6 has exceeded Atlanta's almost every month and has far surpassed Atlanta's coverage over the last year as a whole. Ex. 1, App. B. Indeed, for every story about January 6 in the *Atlanta Journal-Constitution* since January of 2021, there have been at least two in *The Washington Post*. SL Report ¶ 28.[20]

In short, the data shows that for more than 20 months, D.C. residents have been exposed to more constant coverage of January 6 than residents of a comparable district. Consequently, Mr. Loganbill will be unable to seat an impartial jury in this district.

## II.   Transferring this case out of the District is the only way to safeguard Mr. Loganbill's constitutional right to an impartial jury.

---

[20] Again, the ILR Report supports the results of the Select Litigation Survey. Only 4.83% of District respondents said they "never or almost never" follow news coverage as opposed to 13.4% in the Eastern District of Virginia. ILR Report, Table 1(C).

The Supreme Court has recognized certain conditions that make it more difficult for a juror to accurately assess her own bias or to ignore salient community attitudes about the case. *See Rideau*, 373 U.S. at 726-27 (concluding that no review of "the *voir dire* examination of the members of the jury" was necessary to determine that in that case "due process of law. . . required a [transfer]"); *see also, Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows [during *voir dire*] is often its father.").

The presumption of juror prejudice here stems from the small size of this district, its many federal employees, the aftermath of January 6, and the political makeup of D.C., coupled with the government's theory of the case– which make this venue uniquely unlikely to produce an impartial jury. Data confirms extremely high levels of prejudice among potential jurors in this district. Most potential D.C. jurors have already made up their minds that the January 6 defendants are criminals. Many do not realize that they have already prejudged essential elements of the government's case. As a result, even those striving to be honest during *voir dire* and to meet their obligations as jurors, would nevertheless remain partial in ways that *voir dire* could not reveal.

Under these extreme and rare circumstances, prejudice must be presumed, and the Court should transfer this case to another venue to preserve Mr. Loganbill's rights under to the Constitution, or at least pursuant to the Court's discretion under Rule 21. *See Skilling*, 561 U.S. at 446 n.9 (Sotomayor, J., concurring in part and

dissenting in part) (noting that district courts have wide discretion to transfer a case to another venue even if trial in the originating venue would not violate the Constitution, and that it would not have been imprudent to transfer the *Skilling* case given "the widely felt sense of victimhood among Houstonians and the community's deep-seated animus toward Skilling" even if these issues did not preclude a constitutional trial).

Mr. Loganbill is pending trial. As of this filing, D.C. jurors have convicted January 6th defendants on most counts. No jury thus far has entirely acquitted any defendant. By January 2023, more January 6 defendants will have gone to trial. Media outlets will continue the constant coverage of trial proceedings, guilty pleas, verdicts, and sentences. The already-small pool of potentially eligible jurors will shrink, and pretrial publicity will continue to erode potential jurors' impartiality. As a result, the reasons for the Court to presume prejudice will only grow between now and Mr. Loganbill's trial. To ensure that Mr. Loganbill's trial proceeds as scheduled, and that he is tried by an impartial jury, the Court should transfer this case to another suitable venue as soon as possible.

## CONCLUSION

For the foregoing reasons, and any other reasons set forth in additional pleadings or at a hearing on this motion, and that this Court deems just and proper, the Court should transfer the case outside of the District of Columbia for trial.

Respectfully Submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
ELIZABETH MULLIN
ALEXIS GARDNER
Assistant Federal Public Defenders
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500